

# IN THE
# TENTH COURT OF APPEALS

### No. 10-10-00379-CV

**KEY PRODUCTION COMPANY, INC.,**

**Appellant**

**v.**

**QUALITY OPERATING, INC.,**

**Appellee**

### From the 87th District Court
### Freestone County, Texas
### Trial Court No. 04-408-B

## MEMORANDUM  OPINION

Key Production Company, Inc. appeals from a judgment that declared Quality Operating, Inc. to be the present owner of certain depths of mineral interests in three leases and awarded Quality Operating, Inc. and its predecessor, Exxon Mobil Corporation, proceeds from an operating well on the disputed property.  After a bench trial, the trial court determined that the documents in question were ambiguous and determined that the depths in question were not conveyed in the assignment and amendment in dispute, which meant that those depths were owned by Quality.

Key complains that the trial court erred by determining that the assignment in question is ambiguous or alternatively, that if the assignment is ambiguous, the trial court's resolution of the ambiguity in favor of Quality was erroneous. We find that the trial court's determination that the agreement was ambiguous was incorrect, but the trial court's determinations that Quality owns the depths in question and the award of the monies in suspense are correct. Because the trial court's judgment contains no error, we affirm the judgment of the trial court.[1]

*Factual Background*

In 1966, a joint operating agreement was executed that created an area of interest containing seventy-three leases covering over 3,600 acres of land in Freestone County. The agreement set forth percentages of ownership in production of oil and gas from the area. In March of 1968, the working owners of the joint operating agreement created the Pearline Perkins, et al., Smackover Gas Unit. Exxon was a successor in interest to one of the working owners of the joint operating agreement. The Pearline Perkins well was completed and produced in paying quantities.

In 1989, Exxon entered into an agreement to purchase and sell various interests it owned in Oklahoma, Arkansas, and Texas. Included in that agreement were a number of gas units including the Pearline Perkins, et al., Smackover Gas Unit, which were all located in Freestone County. The exhibit attached to the agreement demonstrates that

---

[1] The judgment of the trial court does not refer to the documents in question as being ambiguous; therefore, no modification of the judgment is warranted.

Exxon's interest in the Pearline Perkins, et al., Smackover Gas Unit comprised three leases, the Grizzard, which contained 235.08 acres; the Burleson, which contained 64.31 acres; and the Pearline Perkins, which contained 60.11 acres. These are the three leases at issue in this proceeding.

An assignment was executed and recorded in Freestone County pursuant to the agreement conveying the leases that were located in Freestone County to Gasoven, Key's predecessor in title. The descriptions of the actual leases conveyed were contained in exhibits attached to the assignment. The exhibit attached to the original assignment regarding the Pearline Perkins Gas Unit was the same as the one attached to the agreement to purchase and sell. That exhibit specifically excluded and reserved to Exxon the so-called "deep rights" to the leases, those being the depths below 11,680 feet. Those deep rights are not at issue in this appeal.

The assignment was amended by agreement approximately nine months later. The amendment added a provision to the exhibit regarding the Pearline Perkins Gas Unit that also specifically excluded and reserved to Exxon the Henry Williams, et al. Pettit Gas Unit, which was located at the depth between 6,898 feet and 6,900 feet.

The Henry Williams, et al. Pettit Gas Unit was originally included in the agreement to purchase but had been marked out by hand as being excluded from the transaction prior to the execution of the agreement to purchase and sell. The leases listed on the exhibit describing the Henry Williams, et al. Pettit Gas Unit were 68.68

acres in the Grizzard lease, and the same 64.31 acres in the Burleson lease and 60.11 acres in the Pearline Perkins lease that were included in the Pearline Perkins Gas Unit. The amendment apparently memorializes the exclusion of those portions of the three leases at the depths of the Pettit Gas Unit from the agreement and the assignment. The ownership of the rights in the Pettit Gas Unit is also not at issue in this appeal.

In 1992, Exxon and the other operating owners created the Henry Williams Cotton Valley Gas Unit which covered the formation productive of gas and gaseous substances located between the subsurface depths of 10,142 feet and 10,340 feet. Exxon's interest in the Grizzard, Burleson, and Pearline Perkins Leases were contributed to this unit, although the geographical boundaries of the Cotton Valley Gas Unit overlap the Pearline Perkins Gas Unit's boundaries only in part. The Pearline Perkins well, located within the overlapping geographic boundaries of the two units, had stopped producing from the Smackover formation at some point and was later recompleted to produce within the Henry Williams Cotton Valley Gas Unit without Exxon's consent. The Pearline Perkins well was renamed the Henry Williams No. 2 well when it was recompleted.

In 1996, Gasoven made an assignment of certain oil, gas, and mineral leases to Key Production, which included its interests in the Grizzard, Burleson, and Pearline Perkins leases. Then, in 2001, Quality purchased Exxon's remaining interest in the Grizzard, Burleson, and Pearline Perkins leases.

A dispute arose over the ownership of the proceeds from the Henry Williams No. 2 well between Key Production and Exxon, with each maintaining that it was the owner of the relevant depths. Beginning in 1997, the disputed proceeds from the Henry Williams No. 2 well were kept in suspense pending a determination of ownership, which continued until the time of trial. Quality eventually filed this proceeding against Key seeking a judgment that it has the title to all working interests in the Grizzard, Burleson, and Pearline Perkins leases other than those in the Pettit Formation and the Smackover Geological Formation. Key filed a counterclaim which alleged that it was the owner of the working interests from the surface to a depth of 11,680 feet except for the Henry Williams, et al. Pettit Gas Unit from a depth between 6,898 feet and 6,900 feet.

After a bench trial, the trial court determined that the assignment and amendment to the assignment executed between Exxon and Gasoven were ambiguous. The trial court resolved the ambiguity by finding that the assignment and amendment conveyed to Key's predecessor in title only the interest in the three leases that were in the Pearline Perkins, et al., Smackover Gas Unit and only in the Smackover Formation from a depth of 10,980 feet to 11,680 feet. The trial court then awarded judgment to Quality and Exxon for their respective shares of the monies held in suspense from the production of the newer Henry Williams, et al. Cotton Valley Gas Unit.

*The Language of the Assignment*

The relevant section of the assignment between Exxon and Gasoven states that Exxon, as Assignor, conveyed "all of Assignor's right, title and interest in and to the following real and personal properties …

1. All leases or wellbores or contract rights INSOFAR AND ONLY INSOFAR AS set out in Exhibit A being attached to this Assignment and Bill of Sale and made a part hereof for all purposes, INSOFAR AND ONLY INSOFAR AS these leases or wellbores or contract rights are contained in the units described and set out in the particular Exhibit A, and INSOFAR AND ONLY INSOFAR AS these leases or wellbores or contract rights are subject to the contracts described in Paragraph 2 below or in the particular Exhibit. Assignor excepts from this Assignment and reserves unto itself all other right, title, and interest, including but not limited to any reservation by Assignor of any kind of interest (such as overriding royalty, depths, formations, contractual rights, etc.) from any conveyance or agreement, whether recorded or not, executed or effective prior to the execution of this Assignment, as specified herein."

Exhibit A to the Assignment contains the list of the leases executed by the mineral interest owners that comprised several fields contained within the units being conveyed. The portion of the exhibit in dispute is restricted to the page entitled "PEARLINE PERKINS, ET AL., SMACKOVER GAS UNIT, Teas Field, Freestone County." As previously described, the Grizzard, Burleson, and Pearline Perkins leases are the three that are included in the Pearline Perkins, et al., Smackover Gas Unit and are the subject of this appeal.

The Pearline Perkins, et al., Smackover Gas Unit had been created and recorded in the deed records of Freestone County in 1968. According to the Designation of Unit

that created the Pearline Perkins, et al., Smackover Gas Unit, the unit was formed for the purpose of pooling the leases from the Smackover Geological Formation "into a single unit for the exploration, development, and production of gas and gaseous substances from the Smackover Geological Formation." The "Smackover Geological Formation" was also defined in the recorded designation of unit as "that certain formation productive of gas and gaseous substances which is encountered between the subsurface depths of 10,980 feet and 11,680 feet as measured by the electrical log in the Tidewater Oil Company E.O. Bryant #1-D well which is located 467 feet from the northwest line and 810 feet from the southwest line of the A. Coreo Survey, A-120, Freestone County, Texas."

*Deed Construction*

Key complains that the trial court erred by finding that the assignment and amendment were ambiguous and that the rules of construction and interpretation require a finding that the assignment constituted a conveyance from Exxon to Gasoven of the Grizzard, Burleson, and Pearline Perkins leases from the surface down to the depths of 11,680 feet and that the amendment was executed to specifically exclude the Pettit formation from that conveyance. Key alternatively complains that if the assignment and amendment were, in fact, ambiguous, the trial court erred by resolving the ambiguity against it.

*Standard of Review*

In construing a written agreement, we must ascertain and give effect to the parties' intentions as expressed in the agreement. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (per curiam); *Carbona v. CH Med., Inc.*, 266 S.W.3d 675, 680 (Tex. App.—Dallas 2008, no pet.). We discern intent from the agreement itself, and the agreement must be enforced as written. *Deep Nines, Inc. v. McAfee, Inc.*, 246 S.W.3d 842, 846 (Tex. App.—Dallas 2008, no pet). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank*, 165 S.W.3d at 312. In doing so, we will "avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Id*. (*quoting Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). And, "[i]t is a rule of construction of deeds that they are to be most strongly construed against the grantor and in favor of the grantee, and this rule applies to reservations and exceptions." *Commerce Trust Co. v. Lyon*, 284 S.W.2d 920, 921 (Tex. Civ. App.—Fort Worth 1955, no writ).

Extrinsic evidence of intent is admissible only if the deed is ambiguous on its face. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996). A disagreement about the proper interpretation of a deed, however, does not make the deed ambiguous; the instrument is ambiguous only if, after application of the rules of construction, the deed is reasonably susceptible to more than one reasonable

interpretation.  *Brown v. Havard*, 593 S.W.2d 939, 942 (Tex. 1980); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951).

The issue is ultimately what the phrase "insofar and only insofar as these leases … are contained in the units described" means and how it relates to the rest of the assignment and amendment.

Key argues that the assignment's language that referred to the phrase "contained in the unit" was merely a geographical surface description and that the "insofar and only insofar as" language did not expand the reference to the depths involved.  Key bases this contention on the fact that other language found in the attachments to the assignment expressly subjected the assignment to the original joint operating agreement from the surface to the base of the Smackover Formation and contained the express exception of the depths below 11,680 feet.

Further, Key contends that because the assignment does not itself contain express language defining the specific depths transferred, the conveyance was not limited to the specific depths of the Smackover Geological Formation.  Because of this, Key argues that the assignment unambiguously demonstrates that Key is the owner of the mineral interest from the surface to 11,680 feet.  Key further argues that to find otherwise would not harmonize the assignment, the amendment, and the agreement to purchase and sell. Rather, Key contends that the amendment would become entirely superfluous because if no depths were conveyed other than those contained in the Smackover Formation, the

removal of the Pettit formation from the contract would not have been required to be included in an amendment because Exxon would have retained those rights anyway. Also, Key argues that the reservation of the depths below 11,680 feet would become superfluous as well because the deep rights would still be owned by Exxon if the transfer included only the Smackover Formation.

Quality and Exxon contend that the phrase "insofar and only insofar as these leases … are contained in the units described" is more than a geographical boundary designation but also set the parameters for the depths conveyed as well. Quality and Exxon contend that because of the limiting language used in the assignment, "insofar and only insofar as," the depths conveyed could only have been those that were contained in the designation of the unit for the Pearline Perkins, et al., Smackover Gas Unit, which was very specifically limited to the Smackover Formation from 10,980 feet to 11,680 feet.

Using the pertinent standards for construing a deed, we agree with Key that the assignment and amendment are unambiguous. However, we find that the assignment unambiguously conveyed only the interest in the Smackover Formation and not the depths from the surface to 10,980 feet. We reach this conclusion because, as explained above and as all parties agree, the Smackover Formation[2] is defined by a geographic location on the surface combined with a depth range below the surface. Interpreting

---

[2] The definition of the Smackover Formation is contained in a recorded instrument referenced in the Gasoven Assignment.

the assignment to convey anything above or below that depth range would contradict the definition of "Smackover Formation."

We believe that the language "insofar as and only insofar as" first used in the assignment unambiguously established and defined the geographic area and the second use of the phrase "insofar and only insofar" then described the depths that were to be conveyed in the agreement. The phrase "insofar and only insofar" constitutes a limitation which does not convey an interest to the assignee, nor does it reserve or retain an interest in favor of the assignor; rather, it merely limits the extent of the interest granted. *Petro Pro, Ltd. v. Upland Res., Inc.*, 279 S.W.3d 743, 750 (Tex. App.—Amarillo 2007, pet. denied). The interest granted was first limited to the transfer of the geographical area of the leases that were contained in the unit described. The interest granted in the leases contained in the unit was then further limited to the depths that were included in the designation of the unit. The designation of the unit for the Smackover Formation clearly established and defined those depths that were included. The third use of the phrase "insofar and only insofar as" further limits the transfer making it subject to the joint operating agreement as listed on the exhibit.

We find that the assignment unambiguously transferred the depths from 10,980 feet to 11,680 feet only in the three leases to the extent that those leases were contained in the Pearline Perkins, et al., Smackover Gas Unit. Because of this determination we do not address Key's alternate arguments regarding the resolution of the ambiguity. Key

does not complain of the trial court's disposition of the proceeds other than as it related to the trial court's ruling that Quality is the present owner of the depths in question.

*Conclusion*

Although we find that the trial court's determination that the assignment and amendment were ambiguous was erroneous, the judgment signed by the trial court is, nevertheless, otherwise correct and does not require modification. Therefore, we affirm the judgment of the trial court.

STEPHEN YELENOSKY<br>
Judge

Before Chief Justice Gray,
  Justice Scoggins, and
  Judge Yelenosky[3]
  (Chief Justice Gray concurs in the judgment with a note)*
Affirmed
Opinion delivered and filed March 28, 2013
[CV06]

  * Chief Justice Gray concurs in the Court's judgment. A separate opinion will not be issued. However, Chief Justice Gray notes that he agrees with the trial court's determination that the agreement is ambiguous and would affirm the trial court's resolution of that ambiguity based on the issues raised and record presented.

---

[3] The Honorable Stephen Yelenosky, Judge of the 345th District Court of Travis County, sitting by assignment of the Chief Justice of the Supreme Court of Texas pursuant to section 74.003(h) of the Government Code. *See* TEX. GOV'T CODE ANN. § 74.003(h) (West 2005).